IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

KAREN E. BALSTAD,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.

No. C06-4001-PAZ

**MEMORANDUM OPINION AND
ORDER**

## I. INTRODUCTION

The plaintiff Karen E. Balstad ("Balstad") seeks judicial review of a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XIV Supplemental Security Income ("SSI") benefits. Balstad claims the ALJ improperly weighed the medical evidence, posed improper hypothetical questions to the Vocational Expert, and erred in evaluating Balstad's credibility. (*See* Doc. No. 12)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On January 29, 2002, Balstad filed applications for DI and SSI benefits, alleging a disability onset date of October 31, 2000. Balstad previously had filed applications for DI and SSI benefits on November 27, 2000. Those applications were denied initially and on reconsideration, and Balstad did not appeal. In filing the 2002 applications, Balstad claimed she is disabled due to injuries to her back, pelvis, and left leg as the result of an accident. Her applications were partially granted, and Balstad was determined to have been disabled from October 31, 2000, through June 5, 2002, but not thereafter. She

requested reconsideration of the adverse portion of the decision, and the request was denied.

Balstad requested a hearing, and a hearing was held before ALJ John P. Johnson on May 20, 2004. Balstad was represented at the hearing by attorney Wil C. Forker. Balstad testified at the hearing, and Vocational Expert ("VE") Elizabeth Albrecht also testified.

On October 27, 2004, the ALJ ruled Balstad was not entitled to benefits for the period following June 5, 2002. Balstad appealed the ALJ's ruling, and on December 16, 2005, the Appeals Council denied Balstad's request for review, making the ALJ's decision the final decision of the Commissioner.

Balstad filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On January 25, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. Balstad filed a brief supporting her claim on March 14, 2006. The Commissioner filed a responsive brief on April 24, 2006. Balstad filed a reply brief on April 27, 2006. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Balstad's claim for benefits for the period June 6, 2002, forward.

## B. Factual Background

### 1. Introductory facts and Balstad's hearing testimony

Balstad was born on February ▮▮▮▮. She has completed high school. She is ▮▮▮ tall and weighs ▮▮▮ pounds. She has never been married and has no children. She lives in a trailer.

Balstad worked as a bartender for thirteen years, beginning in 1987. On October 31, 2000, she was in a nearly fatal automobile accident that resulted in a broken femur, a broken tibia, and a floating knee in her left leg. She also fractured her pelvis and

2

some of her "lower lumbars." She had numerous surgeries and other treatments over the ensuing years to treat her injuries.

Balstad testified she can sit for only "a couple of minutes" before experiencing discomfort, although later in the hearing she testified she can sit for ten to fifteen minutes at a time. She testified she feels pain all of the time. According to Balstad, as a result of the accident, her left leg is two and one-half inches shorter than her right leg. This affects her gait, and causes her lower back to hurt. Also, her left ankle was fused from a prior injury. Balstad wears a lift in her left shoe, but her lower back, hip, and knee hurt whenever she walks.

During her recovery from the accident, Balstad took numerous medications, some of which have caused her to have stomach problems, including an ulcer in her colon and stomach ulcers. She is on medication to treat the ulcers.

Balstad testified the pain from her injuries never goes away. She has difficulty sleeping, and she gets up at least three times a night. She is most comfortable when she is lying down. During the hearing, Balstad exhibited discomfort from sitting in the witness chair.

Balstad has a driver's license and can drive, but it "bothers" her back and hip. She drives about ten miles a week.

As a result of the injuries to her left leg, Balstad has begun experiencing problems with her right leg. She stated, "[T]he cartilage is wearing away on my right under my kneecap." She attributes this to the way she walks. She also has trouble going up and down stairs. While standing, she has pain in her hip and back.

According to Balstad, after the accident, from November 1, 2001, to July 7, 2002, she tried to return to work part-time as a bartender, but she could not tolerate the work because of pain in her knee, hip, and back. She is unable to stand or carry much weight.

3

Balstad spends most of her time during the day on the couch watching television. She does her own cooking and cleaning. She uses the computer once in awhile, and goes grocery shopping once or twice a week. She does not visit friends and has no hobbies. She does not belong to any organizations. She is able to walk only a block or two because of pain in her lower back, hip, and knee. She can stand for ten to fifteen minutes before she has to sit or lie down because of pain. She cannot stoop, squat, kneel, or crawl.

## 2. Balstad's medical history

The ALJ accurately described the onset of Balstad's medical problems, as follows:

> On October 31, 2000, the claimant was involved in a very serious motor vehicle accident and sustained a severe complex comminuted fracture of her distal femur with segmental bone loss and complete laceration of the quadriceps mechanism, a severe open segmental fracture of her proximal tibia involving both tibial plateaus, a pelvis fracture, and spinous process fractures of her L5 and S1 vertebrae. On October 31, 2000, she underwent an emergency radical debridement and irrigation of the open fractures, an open reduction and internal fixation with an external fixator and repair of the quadriceps mechanism, and a prior on table angiogram. [ ] The claimant was hospitalized from October 31, 2000 to December 8, 2000.
> The claimant was hospitalized from January 16, 2001 to January 26, 2001. On January 16, 2001, she underwent an open reduction of the distal femur fracture with retrograde IM nail with proximal distal locking and extensive bone grafting, and an extensive quadriceps plasty.

R. 24.

Balstad was admitted to Mercy Medical Center in Sioux City, Iowa, from February 3, 2001, to February 12, 2001, for comprehensive inpatient rehabilitation, "including physical therapy, occupational therapy, rehabilitative nursing and counseling."

4

According to the discharge summary, she made "wonderful progress," but was "vocationally disabled," and had "difficulty with walking."

On February 28, 2001, her surgeon, Gordon A. Porter, M.D., performed an orthopaedic examination of Balstad. He noted the following:

> Karen was reviewed today. She is a patient who had a motor vehicle accident with multiple fractures. She had a Grade II segmental loss fracture of the distal femur and of the proximal tibia which we placed hybrid external fixators on. Once soft tissues had healed we went back and did a retrograde nailing of the femur with a huge allograft bone graft with quadriceps plasty. She is doing quite well. She is ambulating with the knee immobilizer with crutches, nonweight bearing. The knee immobilizer was removed. Quite pleased with her wounds. They are all well healed. She can almost actively extend her knee. She has a 5 degree extension lag. She can only flex to about 45 degrees, and this is going to be the biggest challenge to get her range of motion back in her knee because of the extensive soft tissue injury, the amount of injury to her quads because she had a huge defect in the quadriceps mechanism initially when we saw her after her original injury.

Dr. Porter saw Balstad again on March 22, April 19, and May 17 and 21, 2001, and was happy with her progress.

On June 18, 2001, Dr. Porter decided to perform surgery to address Balstad's continued pain. On June 22, 2001, he removed three screws from her femur, repositioned and refixated the rod in her leg, and performed a quadricepsplasty. Balstad was discharged from the hospital two days after the procedure. Steven J. Stokesbary, M.D., an associate of Dr. Porter's, evaluated Balstad on July 5, 2001, and noted that she was getting around well and was not taking any pain medicine.

On July 26, 2001, Dr. Porter conducted an orthopaedic examination of Balstad. He noted she no longer was having any extension pain. He was pleased with her hamstring strength and overall progress, but noted "her quad strength still needs a little work. On

August 30, 2001, Dr. Porter performed an orthopaedic examination of Balstad and noted she was "getting along quite nicely." He observed she "is never going to have a normal knee or leg," but he was "quite pleased with her progress."

On August 14, 2001, Dr. Porter wrote a letter summarizing Balstad's condition at the time as follows:

> Karen is a patient of mine who I have been looking after since Oct. 31, 2000. She was involved in a severe motor vehicle accident in the Sioux City area. She had a severe Grade II compound open fracture of her distal femur with segmental bone loss, intra-articular into the knee joint. Also fracture of the proximal tibia, into the knee joint, which was open. It was dysvascular at the time of the injury, but we were able to reestablish blood flow and through a series of a number of operative procedures, which at this point in time now totals four or five, we have reconstructed her lower extremity and have stabilized her situation. She, however, is still very dependent upon physical therapy. She has significant physical limitations at the present time. She can't walk independently. She is using now a cane, but has significant restrictions in her range of motion and is going to require some ongoing physical therapy. Her previous job involves her on her feet all day long. She is certainly unable to do this kind of activities, and will likely be another 2-3 months possibly until she can do this.
>
> If you need further medical details regarding her operative treatment in reference to her application, then please do not hesitate to contact this office. Suffice this to say that Karen is quire lucky to have salvaged her leg at this point in time, and I do expect her to continue to improve with time. It is going to be a number of weeks to even months before she is going to be I think ready for gainful employment.

Dr. Porter continued to follow Balstad throughout the remainder of 2001. On December 6, 2001, he noted the following:

> [Balstad] is maintaining fairly well. Her function isn't going to be 100%, never will be. She is maintaining a pretty

reasonable activity level. She is working about 15 hours a week now. . . . At present, I don't know that we can make her function very much better at this point in time[.] [S]he is going to build up her work hours, and I am going to review again in two months time. . . .

On January 10, 2002, Dr. Porter noted as follows:

[Balstad] actually was getting along until very recently. She called in to complain of significant pain in her knee and distal femur. Subsequent x-rays showed that the nail had migrated more distally. The distal crossing screw had fractured. I think the proximal segmental portion of the fracture in the supracondylar area has probably failed and this is the reason for the shortening and the screw fracture and the nail migration. She has got severe pain in her knee because the distal end of the IM nail is irritating in the patella.

Dr. Porter felt the dilemma could be "salvaged" by a complicated procedure involving removal and replacement of the nail.

On January 11, 2002, Dr. Porter admitted Balstad to the hospital. He performed surgery, as follows: "The retrograde nail was removed through the knee, we then opened the fracture and placed a very large, from the right iliac crest, corticocancellous bone grafting with an antegrade nail, which we reamed locking proximally and distally." Balstad was released from the hospital, ambulating with crutches, on January 15, 2002.

Dr. Porter saw Balstad on January 24, 2002, and again on February 21, 2002, to follow her recovery. He saws her again on March 14, 2002, and he noted he was "really pleased at the progress she is making." On April 25, 2002, Dr. Porter noted Balstad "was getting along quite well" and she had very little pain. He observed that she had a one-inch leg length inequality. On June 6, 2002, he observed that her condition was unchanged, except for "a little bit of knee pain and patellar pain." He measured a three-quarters of an inch leg length discrepancy, and prescribed a leg length lift.

7

On August 8, 2002, Dr. Porter saw Balstad for followup. He noted she had done well, but was complaining of some pain over the distal medial aspect of her thigh. He stated Balstad's healed fracture was "painful to her," so he arranged to have two screws removed from the fracture site. The screws were removed on August 13, 2002. On August 26, 2002, Dr. Porter noted Balstad no longer had pain from the prominent screw, and she was "doing fairly well otherwise."

In a note dated October 10, 2002, Dr. Porter indicated Balstad had stumbled going down some stairs and had twisted her knee. She had "some discomfort in her knee and thigh." In a note to X-ray findings dated November 7, 2002, Dr. Porter stated that where the screw had been removed, "the nail may have cracked." He noted that if Balstad continued to have problems, he might need to do further investigation. Balstad seemed to be "[g]etting along a little bit better regarding her leg. Less pain, less spasm." Dr. Porter adjusted the size of the lift in Balstad's shoe.

On November 7, 2002, Dr. Porter described Balstad's condition as "[g]etting along a little bit better regarding her leg. Less pain, less spasm." On January 16, 2003, she was "getting along fairly well." She had very little pain in her thigh, and seemed to walk "fairly well." However, in his notes, Dr. Porter stated the following: "I think her future is going to involve her doing sit down activities only and I think that this will certainly limit her opportunities in the future in a significant way."

Dr. Porter next saw Balstad on December 4, 2003. He stated the following:

> Karen was reviewed today. Still having the same sort of problems with her left knee. It is never going to be normal. It is never going to have normal range of motion or strength. She had a leg length inequality and I do not think this will ever allow her to work in a standing position for any period of time. She might be able to do some sit down work, but she is really going to have a lot of restricted activity in both sitting and standing and I think this is a long term problem. She has been having more problems now with her right knee with some

> patellofemoral pain, catching, clicking and problems going up
> and down stairs. No swelling, no giving way, no locking. No
> hip pain. She is having some back discomfort as well and it is
> because of the way she is walking, but no radicular like
> symptoms.

An examination on January 8, 2004, showed that Balstad "still ha[d] some pain in
the retropatellar area, in the upper lateral portion." She was given a Cortisone injection.
On March 18, 2004, Balstad told Dr. Porter her right knee was "starting to feel a lot better
and the Cortisone injection helped immensely." Her right knee showed "good extension,
good flexion. A little bit of patellar pain, but really nothing like she had before. She is
walking better." Dr. Porter summarized as follows:

> So I am pleased with her progress. She is certainly, I do not
> think, ever going to do a standing job or anything that will
> involve any walking at all because of her ongoing problems
> and I know that I think she has filed for disability. I think she
> warrants this on the basis of her severe injuries and has
> maintained a stable presence at this point and time, so we will
> see how things go and she will be back in touch with me on a
> prn basis.

*Id.*

On May 17, 2004, three days before the ALJ hearing in this case, Dr. Porter wrote
a letter to Balstad's attorney summarizing her history and her current condition.
Dr. Porter stated, in part, the following:

> The present status for Karen after a number of years for
> surgery is that we salvaged her left lower extremity, and she
> is left with a significant disability to this extremity.

> She has a 2½" leg discrepancy, her left is shorter than the
> right. She has marked decreased range of motion in her knee
> joint. She has from -5, -10 of extension to just barely 80
> degrees. She has undergone months literally of physical
> therapy, and is to the point where she is presently stable and
> left in my opinion with a significant restriction.

9

She has healed fractures. She has been left with major limitations to her knee and left lower extremity and because of the extremity problems and her gait being a shortened gait she has significant stress in her lower back and because of this has ongoing lower back pain.

She certainly can comfortably sit. She has limitations in walking. She really cannot walk in excess of 50-100 feet. She has been fashioned with an orthotic to try to increase the size of her shoe and it basically requires her to have about 1½" sole raise on her shoe to try to balance her pelvis. However, despite that she still has a bit of asymmetry in the pelvis and in her gait. This imparts some chronic pain to her lower back.

She presently takes anti-inflammatory medications. She is pretty much taking Ibuprofen or Aleve which is a generation 1 anti-inflammatories and she is likely going to be on these on a chronic basis.

Diagnosis therefore is severe complex series of fractures in her lower extremities which basically has left her with an ankylosed or very stiff knee, degenerative knee or arthritic knee, leg length inequality of 2½ inches and a totally nonfunctional extremity. She was first seen for this injury in October 2000. She has had numerous visits. She has had a number of surgical interventions and I think she is not going to improve her physical status any greater than she is at present. The chance of her deteriorating her knee function to require eventually a knee replacement surgery is almost a certainty. Because of her gait, she is severely limited from her function and is also having a lot of mechanical strain to her lower back and has some chronic lower back pain. The prognosis for improvement is virtually none and the prognosis for continuing degeneration in her knee and in her back is to be expected.

She has limitations with standing, walking and sitting. With sitting because she does not have a normal range of motion it is very difficult for her to get up from a sitting to a standing position. She has marked limitations in walking and in her standing ability. She can walk virtually 50 feet but is going to

continue to be limited from this and will have a future and life long limitation with this in my opinion. Regarding standing, she may be able to stand for several minutes but certainly cannot stand in a position where she can work as she once did as a bartender, and I am not suggesting that she consider this form of employment. She is limited even in her activities of daily living because of the leg length inequality in her extremity despite the shoes lift and because it imparts ongoing chronic pain in her knee and back. I think that she will require medication in the future, and this could be a life long requirement as well.

I definitely think that Karen's problems are disabling not only for the work status but for going through activities of daily living as well. The prognosis for her to require surgery in the future including total knee replacement is almost going to be expected.

## 3. Vocational expert's testimony

The ALJ asked the VE the following hypothetical question:

My first assumption is that we have an individual who is 45 years old. She is female. She has a high school education . . . . And she has the following impairments. She is status post motor vehicle accident with a fracture of the left femur with open reduction and internal fixation, history of a fracture of the pelvis and lumbar vertebra. And a history of bowel obstruction. As a result of the combination of those impairments she has the residual functional capacity as follows. She could not lift more than 20 pounds, routinely lift 10 pounds. She should not walk or stand for more than two hours out of an eight-hour day. She could sit for at least six hours out of an eight-hour day. She can only occasionally squat, kneel, crawl, or climb. She could not continuously operate foot controls with the left foot. This individual should not work at unprotected heights. Would this individual be able to perform any jobs she previously worked at either as she performed it or as it is generally performed within the national economy?

11

The VE answered that the hypothetical individual would be unable to return to Balstad's past work as a bartender, which was classified as light work. However, the VE testified the individual would be able to perform some sedentary jobs, such as check cashier, gambling cashier, and auction clerk.

The ALJ then asked the VE a second hypothetical question:

> My next hypothetical would be an individual with the same age, sex, education, past relevant work and impairments as previously specified and this would be an individual that would have the residual functional capacity as follows. She could not lift more than five to 10 pounds. No standing of more than 10 to 15 minutes at a time. No sitting of more than 15 to 20 minutes at a time. And no walking of more than one to two blocks at a time. Only occasional bending, stooping or climbing. No squatting, kneeling or crawling. This individual should not work at unprotected heights or around hazardous moving machinery. . . . Would this individual be able to perform – or transfer acquired skills to other work within the national economy?

The VE answered that the standing and sitting limitations "would preclude that individual from sedentary jobs," and the individual would not be able to perform even unskilled work.

## 4. *The ALJ's decision*

The ALJ found that Balstad's allegations of total disability were not credible. First, he found the objective medical evidence indicated Balstad's pelvis, back, and left leg fractures had healed, and "there is nothing in the medical records to indicate that the claimant has suffered severe, disabling, pain since June 5, 2002." Second, he relied on state agency medical consultants who evaluated Balstad's condition and determined she has been capable of performing sedentary work since June 5, 2002. Third, he noted Balstad only used over-the-counter pain relievers. Fourth, he noted Balstad had testified she can

12

sit for only fifteen to twenty minutes at a time, but on May 17, 2004, Dr. Porter opined she was capable of sitting comfortably. Finally, the ALJ concluded Balstad's reported activities of daily living were inconsistent with her allegations.

The ALJ found as follows:

> Having considered the evidence of record most carefully, . . . since June 5, 2002, the claimant has retained the residual functional capacity to lift and carry up to 20 pounds occasionally and ten pounds frequently. She can sit for a total of about six hours in an eight-hour day with normal breaks. She can stand or walk for a total of about two hours in an eight-hour day. She can occasionally squat, kneel, crawl, or climb. She cannot continuously operate foot controls with her left lower extremity. She cannot work in unprotected heights.

Based on these findings, the ALJ found Balstad could perform the jobs identified by the VE in response to the ALJ's first hypothetical question, and therefore she was not disabled.

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra.* The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

15

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to

16

support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline v. Sullivan*, 939 F.2d 560, * (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse

17

the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.*, 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen*, 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;

5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

This dispute comes down to the resolution of a simple question: Was Balstad able to work after June 5, 2002? The ALJ concluded that she was, and therefore denied her claim for benefits for the period after June 5, 2002. He reached this conclusion, in part, because he found Balstad could sit for six hours in an eight-hour day, and she could stand or walk for a total of about two hours in an eight-hour day. According to the VE, with these capabilities, Balstad would be able to perform a number of sedentary jobs. Also according to the VE, if Balstad could not, as she testified, stand or sit for more than fifteen to twenty minutes at a time, she would not be able to perform any work in the national economy.

At the outset, the court notes there is no evidence in the record to support denying Balstad benefits as of June 5, 2002. Before the ALJ hearing, the Commissioner already had determined that Balstad was disabled from October 31, 2000, the date of her accident, until June 5, 2002. The record before the ALJ established that as of June 5, 2002, Balstad was still in the process of attempting to recover from her serious injuries, and was not able to return to full-time work on that date. As of August 8, 2002, Balstad was still suffering pain at the site of her fracture, and a surgery was performed to address the problem on August 13, 2002. On January 13, 2003, Dr. Porter opined *any* type of activity involving a lot of standing would be prohibited, and "her future is going to involve her doing sit

19

down activities only and . . . this will certainly limit her opportunities in the future in a significant way."

In ruling that Balstad was not disabled after June 5, 2002, the ALJ decided Balstad was able to sit for six hours and stand or walk for two hours in an eight-hour day. He reached this conclusion by accepting the opinions of non-examining physicians, rejecting the opinions of Balstad's long-time treating physician, Dr. Porter, and ignoring Balstad's testimony at the hearing. Even applying a deferential standard of review to this conclusion, the court finds the ALJ was in error.

While it is true that a non-examining DDS physician opined Balstad could "sit for a total of about six hours in an eight-hour day with normal breaks, [and] [s]he can stand or walk for a total of about two hours in an eight-hour day,"[1] this opinion was out of thin air. There is nothing to support it in the record. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence," particularly where the opinion is not supported by the objective medical evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

Similarly, the attempts of the ALJ to discredit the opinions of Dr. Porter and Balstad are not supported by substantial evidence in the record. The ALJ's statement that "there is nothing in the medical records to indicate that the claimant has suffered severe, disabling, pain since June 5, 2002," simply is not accurate. The record contains numerous references to Balstad's complaints of pain after that date, and Dr. Porter repeatedly discusses in his records the disabling nature of that pain. For example, on December 4, 2003, Dr. Porter noted, "[Balstad] might be able to do some sit down work, but she is

---

[1] Actually, this page from the administrative record, page 375, containing this exertional limitation, is illegible, but the court will assume the ALJ has accurately described the DDS physician's conclusions. To the extent these conclusions have any probative value, they are eroded considerably by the fact that DDS reached the same conclusions on August 23 and 27, 2001, when Balstad was in the middle of the primary treatment for her injuries, and when the Commissioner agrees that Balstad was disabled. *See* A.R. 261, 267.

really going to have a lot of restricted activity in both sitting and standing and I think this is a long term problem."

The ALJ tried to discredit Balstad's testimony that she could sit for only fifteen to twenty minutes at a time by pointing out that Dr. Porter, in his report dated May 17, 2004, said Balstad "was capable of sitting comfortably." In his report, Dr. Porter did state that Balstad "certainly can comfortably sit." However, he did not state she could sit comfortably for any particular period of time, or that she could sit for six hours in an eight-hour work day. In fact, he made several statements that contradicted such a conclusion, including: "Because of her gait, she is severely limited from her function and is also having a lot of mechanical strain to her lower back and has some chronic lower back pain." "She has limitations with standing, walking and sitting. With sitting because she does not have a normal range of motion it is very difficult for her to get up from a sitting to a standing position." "She is limited even in her activities of daily living because of the leg length inequality in her extremity despite the shoes lift and because it imparts ongoing chronic pain in her knee and back." A.R. 424

In *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians:

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have

21

upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, *see Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13.

The court finds the ALJ gave insufficient reasons for his failure to give Dr. Porter's opinion great weight.

The ALJ also attempted to discredit Balstad by pointing out she uses only over-the-counter medications instead of prescription medication to treat her pain. Although failure to use stronger pain medications may be inconsistent with a claim of disabling pain, *see, e.g., Harris v. Barnhart*, 356 F.3d 926, 930 (2004), viewing the record as a whole, the court does not find Balstad's use of over-the-counter pain medications to be dispositive, particularly where her treating physician noted she likely would be on those medications "on a chronic basis."

Finally, the ALJ found Balstad's reported activities of daily living to be inconsistent with her allegations of disability. As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'" *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)). Further,

> [A]n SSI claimant need not prove that she is bedridden or
> completely helpless to be found disabled and the fact that
> claimant cooks and cleans for herself, shops for groceries,
> does laundry, visits friends, attends church, and goes fishing
> does not in and of itself constitute substantial evidence that a
> claimant possesses the residual functional capacity to engage
> in substantial gainful activity.

*Cline* , 939 F.2d at 566 (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)).
The court finds that for the period in question, Balstad was unable to perform the requisite
physical activities required by competitive employment.

The ALJ improperly weighed the medical evidence and improperly discredited the
testimony of Balstad and the opinions of her treating physician. The court finds the ALJ's
decision to deny benefits to Balstad after June 5, 2002, is not supported by substantial
evidence in the record.

## V.  CONCLUSION

Having found that Balstad is entitled to benefits, the court may affirm, modify, or
reverse the Commissioner's decision with or without remand to the Commissioner for a
rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly
establishes disability and further hearings would merely delay receipt of benefits, an
immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569
(citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v.
Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d
996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national
economy, remand to take additional evidence would only delay receipt of benefits to which
claimant is entitled, warranting reversal with award of benefits).

Accordingly, for the reasons discussed above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner to calculate and award benefits for the period after June 5, 2002.

**IT IS SO ORDERED.**

**DATED** this 1st day of November, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT